[L. A. No. 1221. Department One.—February 17, 1904.]

## ROBERT GRIBBEN, Respondent, v. YELLOW ASTER MINING AND MILLING COMPANY, Appellant.

MASTER AND SERVANT—IMPROPER USE OF APPLIANCES—NEGLIGENCE OF PLAINTIFF AND FELLOW-SERVANTS.—Where the master has discharged his duty to his servants in furnishing them with proper appliances for their work, the improper use of the appliances by the plaintiff and his fellow-servants will preclude recovery by the plaintiff against the master for the resulting injury.

ID.—INJURY FROM BREAKING OF ROPE IN SHAFT—MISUSE OF ROPE.— Where a rope, windlass, and bucket were furnished by the master solely for the purpose of drawing gravel up a mining shaft, and was improperly used by the miners for the purpose of descent, a ladder having been provided therefor, and was also improperly used in dragging gravel from a drift, for which a wheelbarrow and plank were furnished, a miner injured in descent by the breaking of the rope, through such misuse thereof by himself and his fellow-servants, without evidence of the knowledge of the master as to such misuse, or his sanction thereof, cannot recover for the injury thereby sustained.

ID.—ERROR IN EXCLUDING EVIDENCE—PURPOSE OF APPLIANCES—INSTRUCTION TO MINERS.—The court erred in excluding evidence as to the purposes for which the rope and other appliances were furnished, and that the miners were properly instructed as to the proper use of them, and were never instructed to the contrary.

ID.—IMPROPER INSTRUCTION TO JURY.—An instruction to the jury which improperly assumed that the only means of descending the shaft

was the rope, and that it was furnished for that purpose, and which ignored the question whether, if the rope was worn or weakened, the carelessness or negligence of the plaintiff and his fellow-servants caused the same, was prejudicially erroneous.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. N. P. Conrey, Judge.

The facts are stated in the opinion of the court.

Herbert Cutler Brown, for Appellant.

The fact of the accident does not raise a presumption of negligence in such a case as this, the burden being upon the plaintiff to show negligence. (Black on Accident Cases, p. 220; *Brymer* v. *Southern Pacific Co.*, 90 Cal. 496; *Sappenfield* v. *Main-Street etc. R. R. Co.*, 91 Cal. 48; *Gier* v. *Los Angeles etc. Ry. Co.*, 108 Cal. 133; *McAlpine* v. *Laydon*, 115 Cal. 72.) The evidence was insufficient to show any negligence or liability of the defendant, and a nonsuit should have been granted. Gribben chose to use the rope for his own descent, when other means of descent were provided, and he assumed the risk of his own act and that of his fellow-servants. (*McAlpine* v. *Laydon*, 115 Cal. 72; *Yearsley* v. *Sunset Tel. etc. Co.*, 110 Cal. 236; *McGlynn* v. *Brodie*, 31 Cal. 377; *Baxter* v. *Roberts*, 44 Cal. 187;[1] *Sowden* v. *Idaho Q. M. Co.*, 55 Cal. 443; *Sweeney* v. *Central Pacific R. R. Co.*, 57 Cal. 15; *Fisk* v. *Central Pacific R. R. Co.*, 72 Cal. 38;[2] *Magee* v. *North Pacific Coast R. R. Co.*, 78 Cal. 430;[3] *Ingerman* v. *Moore*, 90 Cal. 410;[4] *Sappenfield* v. *Main-Street etc. R. R. Co.*, 91 Cal. 48; *Burns* v. *Sennett*, 99 Cal. 363; *Verdella* v. *Gray's Harbor Com. Co.*, 115 Cal. 517; *Holmes* v. *Southern Pacific Co.*, 120 Cal. 357; *Limberg* v. *Glenwood L. Co.*, 127 Cal. 598; *Donovan* v. *Ferris*, 128 Cal. 48;[5] *Silviera* v. *Iverson*, 128 Cal. 187.) The court erred in excluding evidence to show, by relevant evidence under the pleadings, that the rope was not intended for the purpose of descent or of drifting, and to show how the miners were instructed. (*Hennesey* v. *Bingham*, 125 Cal. 635.)

[1] 13 Am. Rep. 160.
[2] 1 Am. St. Rep. 22, and note.
[3] 12 Am. St. Rep. 69.
[4] 25 Am. St. Rep. 138.
[5] 79 Am. St. Rep. 25.

Kendrick & Knott, and Adcock & Reymert, for Appellant.

Proof of the accident was *prima facie* evidence of defendant's negligence. (*Judson* v. *Giant Powder Co.*, 107 Cal. 555;[1] Shearman and Redfield on Negligence, sec. 60.) The defendant was bound to know the condition of the rope, and plaintiff was not bound to know it, the contrary not having been made to appear. (*Silviera* v. *Iverson,* 128 Cal. 192; *Mullin* v. *California Horseshoe Co.*, 105 Cal. 83, and cases cited.) The court having found that there was no negligence of plaintiff or his employer, the verdict is conclusive. (*Fox* v. *Oakland Cons. St. Ry.*, 118 Cal. 61;[2] *Sanborn* v. *Madera Flume etc. Co.*, 70 Cal. 261; *Goggin* v. *Osborne & Co.*, 115 Cal. 437; *Habishaw* v. *Standard etc. Co.*, 131 Cal. 430.) If the negligence of the master combines with the negligence of a fellow-servant the master is liable. (*Fisk* v. *Central Pacific R. R. Co.*, 72 Cal. 42;[3] Thompson on Negligence, p. 981.)

VAN DYKE, J.—The action is to recover damages for personal injuries occasioned to the plaintiff by the breaking of a rope by which he was being lowered to the bottom of a shaft while in the employ of the defendant corporation. Verdict and judgment went for the plaintiff in the court below, and defendant appeals from said judgment and from the order denying a motion for a new trial.

In the specifications on the part of the defendant in its statement on motion for a new trial it is claimed: 1. That there is no evidence of negligence on the part of the defendant; that the evidence proved that the accident alleged, which resulted in the injury to the plaintiff, was caused by the negligence of the plaintiff and the negligent acts of the fellow-servants engaged with the plaintiff in the same general employment; 2. Alleged erroneous rulings of the court during the progress of the trial and the introduction of evidence; and 3. Certain instructions given by the court to the jury.

1. The plaintiff testified that he was employed by the defendant on the twenty-eighth day of July, 1900, at Randsburg. He said he was sent down to the well to help them down there near what is called Goler, six or seven miles from Randsburg,

[1] 48 Am. St. Rep. 146.        [3] 1 Am. St. Rep. 22, and note.
[2] 62 Am. St. Rep. 216.

where the company was doing work, laying the foundation for a pump, reservoir, etc. He said he was directed to go down into the gravel-pit to take out some gravel to get ready for the concrete for said foundation. It appears there was a shaft about twenty feet in depth, and from the foot of the shaft were drifts in opposite directions some ten feet or more from the foot of the shaft, and the gravel was taken from these drifts and hoisted up the shaft by means of a rope and bucket. The drifts were six or seven feet high. He says the way he was lowered, he put his foot in a loop of the rope and was lowered by the men at the windlass at the top of the shaft by allowing the rope to unwind; and on the day in question, while he was being lowered, the rope broke and he was dropped down and his leg injured, or, as he says, "smashed up." On cross-examination he was asked: "Did any one tell you to go down on that rope?—A. They told me to go down and take out gravel. That was the only way to get down there.— Q. Did you see any ladders down there?—A. No. There was no ladders in the hole.—Q. Were there no ladders around the hole?—A. I don't know. I didn't look to see whether there was any on top or not." The only other witness on the part of the plaintiff was the physician who treated him, and who testified to the extent of the injuries he received from the fall by the breaking of the rope. The only witnesses on the part of the defendant as to the accident were Robert Smith and Dan McCusker, employees of the defendant, with the plaintiff at the time, but who were not in the employ of the defendant at the time of the trial. Smith testified that he had been working for the defendant corporation from the beginning of the May previous, and that the rope on which the plaintiff went down the shaft was there to hoist gravel with. On the cross-examination of this witness, however, it was shown that there were ladders furnished, and were at the place, if the employees wanted to use them, for the purpose of going down the shaft. He was asked: "Do you know why the rope broke?— A. By wearing against the top of the drift, sir.—Q. How was the break?—A. Well, it got pretty well wore and it was pulled right in two the same as you would pull a piece of rope out when it was pretty well wore, right in two. I don't know how long the rope had been used on that windlass. We had

been working on the windlass about seven or eight days.''
McCusker testified on behalf of the defendant that he was
working at the place with the plaintiff in July at the time of
the accident, and says that ''It was a new rope, first-class
rope, could n't be no better rope bought. Everything that
come down there was first-class material for that work. It
had been used there about three weeks before it broke.—
Q. What was the cause of the breaking of that rope if you
know?—A. From dragging the bucket in on that drift, and
—dragging and scraping on the roof of the drift as it come in.
The roof of the drift was gravel and jagged rocks and sand.
The rope was a good rope, only that one place that they
dragged it on the roof of that drift. If it had not dragged
there it would n't have broke. It would have carried up a
ton. It was a new rope.'' He was asked whether there was
any other means by which the men could get down the shaft
other than by the rope. ''A. Why, there was ladders there
within ten feet of them they could have put down if they had
wanted to.'' On cross-examination the witness was asked:
''Why do you mention a ladder? Were you told to go down
on a ladder?—A. Well, the ladders was there for that pur-
pose.—Q. How do you know that?—A. Why, they were
made for that—the foreman of the mine; and I throwed them
away there.—Q. Were the ladders ever used for that purpose
at all?—A. Well, they was put down the shaft when he got
his leg broke.'' It appears further that there was a wheel-
barrow at the foot of the shaft and a plank running out into
the drift for the purpose of bringing the gravel from the end
of the drift to the foot of the shaft to be placed in the bucket
and hoisted to the top, but the employees, including the plain-
tiff, hauled the bucket back from the foot of the shaft to the
end of the drift and there filled the bucket. Further, on cross-
examination, the witness was asked: ''Did you examine where
the break occurred, whether broken off short, or whether it
was one strand broken in one place, and another strand
broken in another place?—A. It was a long break. Just
pulled apart, the way it was sawed off when they had it
on the top of the drift.—Q. How is that?—A. The top of the
drift sawed it off, and that was a long—the parting was long,
you know; it did n't break off short.—Q. Well, now the edges
where it broke in two, were they at all square?—A. No, sir;

it was not.—Q. Well, how is that?—A. Because it was wore. It was ragged, some parts of the rope was thinner than others, where it dragged. It wore worse in one place, may be, than it did in another, may be it had a little more friction on it, you know, and it might.—Q. Well, your idea, then, is that the reason it broke was because it was worn?—A. Worn on—dragging on the top of the roof of that drift. And they pulled the bucket in, as well as the—they all pulled it in—they every one pulled it in. If the man went and took the gravel out to the main shaft and put it in the bucket and h'ist it up in the bucket, it was perfectly safe.—Q. That is the way you think it became worn?—A. That is the way it broke and that is the way the accident happened. There is no better rope was ever put in a shaft than that was, and that was the way it was broke. It was their fault." Witness Smith was asked: "Why did you put the gravel into the bucket inside of the drift and drag it out through the drift into the bottom of the shaft by the rope, instead of by carrying it out on a wheelbarrow?—A. Well, because it was easier to do that way." There was no evidence in conflict with the above.

2. The court in its rulings and instructions followed the plaintiff's theory of the accident, and held substantially that it was quite immaterial whether ladders were furnished for going down the shaft, or whether the rope became weakened through improper use of it by the plaintiff and other employees.

Witness Smith was asked whether the rope was intended to lower people on, to which the plaintiff objected, on the ground, among others, that it was incompetent, and the court sustained the objection. The same witness was asked whether they were instructed to take the earth out by putting it in a wheelbarrow and taking it to the foot of the shaft that way, which was objected to by the plaintiff on the ground that it was not competent, relevant, or material.

"*The Court.*—What is the object of the question, Mr. Brown?

"*Mr. Brown.*—The object of the testimony, your honor, is to show that the purpose for which this rope was placed upon the windlass and used, was for the purpose of hauling up the gravel from the bottom of the pit or shaft; that, as matter of

fact, they used it to drag the gravel out from the drift; that there were other means provided for bringing that gravel from the bottom of the drift out to the point immediately below the windlass.

"*The Court.*—The objection is sustained."

He was again asked: "Were you ever instructed to put the gravel into the bucket inside of the drift and drag it out in the manner stated to the bottom of the shaft?" The answer to this question, upon objection of plaintiff, was also ruled out. The questions asked and ruled upon by the court were material under the issues made by the pleadings. It was alleged in the complaint that it was necessary in order for the plaintiff to get to the bottom of said excavation that a rope or other like means or appliance should be provided, and that said defendant provided such rope for that purpose, and that said rope so furnished by the defendant was of insufficient strength to sustain the plaintiff's weight, and suddenly broke and was the cause of the injury complained of. The answer denies that it was necessary, in order for plaintiff to get to the bottom of the shaft, to use a rope or like appliance, and denies that the defendant was grossly or otherwise negligent in any respect in supplying or making use of any rope, or that in consequence of any defect in the rope the injury was caused to the plaintiff, and denies that said rope was not of sufficient strength to serve the purpose for which it was intended to be used, and alleges that if there were any defects or imperfections they were due solely to the act and fault of the plaintiff and other fellow-servants.

3. The following is one of the instructions given by the court to the jury: "And if you believe from the evidence that the plaintiff, Robert Gribben, was injured as alleged in the complaint, and that said injury was proximately caused by the defect in the rope furnished by the defendant as alleged in the complaint, then and in that case you will find a verdict for the plaintiff, unless you further believe from the evidence that the plaintiff knew of the defect in the rope, or unless the defect in the rope was so obvious that the plaintiff must have known of the defect, or that prior to the injuries the plaintiff was put upon inquiry by some discovery or suggestion of danger which it was gross carelessness for him to neglect."

So it will be seen that the court assumes that the only means of going down the shaft was the rope; that it was furnished by the defendant for that purpose, and ignores altogether the question whether, if the rope were worn or weakened, the carelessness or negligence of the plaintiff and his fellow-servants caused the same.

Undoubtedly the rule of law is as claimed by the plaintiff, that it is the duty of an employer to furnish his employees reasonably suitable and safe machinery and appliances with which to do the work required of them, and to keep such machinery and appliances in repair and order. It is also a rule of law that an employer is not bound to indemnify his employee for losses suffered by the latter in consequence of the ordinary risks of the business in which he is employed, nor in consequence of the negligence of another person employed by the same employer in the same general business, unless he has neglected to use ordinary care in the selection of the fellow-employee. (Civ. Code, 1970.) If the employee makes improper use of the instrumentalities furnished by the employer for the work in hand, and injury results to himself therefrom, it is his own fault, and he has himself to blame, and cannot hold the employer responsible. Here the evidence is uncontradicted that ladders were furnished for the men to go down in the shaft. The plaintiff says he did not look to see any ladder, although they were on the ground within ten feet of the windlass. It does not relieve the plaintiff from the consequences of his own fault or negligence because his fellow-workmen committed the same fault. The rule in reference to the negligence of the plaintiff and his fellow-employees applies also to the use of the rope for hauling the bucket out of the drift at the foot of the shaft. There was a wheelbarrow and a plank on which to run it, furnished by the employer for the purpose of bringing the gravel from the head of the drift to be dumped into the bucket at the foot of the shaft. Notwithstanding this fact, the men—the plaintiff included—hauled the bucket to the head of the drift and when filled—the rope remaining attached—gave the word to hoist, and thus have the bucket dragged back to the foot of the shaft, the rope, as testified, scraping over the gravel and jagged stones on the roof of the drift. The plaintiff having been engaged in mining,

as he testified, some thirty-seven years, must have known that this was an improper use to put the rope to.

Further, the answer in substance denies that the rope was provided by the defendant to be used as a means of lowering the employees into the shaft, and there is no sufficient evidence to show that the defendant intended it to be used for that purpose, or for any purpose other than to lower and hoist the bucket. The plaintiff and his fellow-employees did, indeed, use it as a means of getting down to the bottom of the shaft, but there is no evidence that defendant was aware of such use, or had ever authorized or intended its application to that purpose; and, if said company did not furnish it for such purpose or know it was so used, it could not be held liable.

The rulings of the court and instruction referred to must necessarily have influenced the jury to the prejudice of the defendant.

The judgment and order denying a new trial are reversed and the cause remanded.

Shaw J., and Angellotti, J., concurred.

Hearing in Bank denied.